UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| BRIAN J. MURPHY, | ) |
| plaintiff, | ) JURY TRIAL DEMANDED |
| v. | ) Case No. 21 -_____ |
| CATERPILLAR INC., a Delaware corporation, | ) |
| defendant. | ) |

## COMPLAINT

Plaintiff Brian J. Murphy, by his undersigned counsel, alleges for his Complaint against defendant Caterpillar Inc. ("Caterpillar" or "defendant"), and demands a trial by jury, as follows:

### ALLEGATIONS COMMON TO ALL COUNTS

#### The Parties

1. Plaintiff is an individual residing in the Village of Morton, Tazewell County, Illinois. Plaintiff was born on June 21, 1959.

2. Caterpillar is a corporation organized under the laws of the State of Delaware, with its headquarters and principal operations located in Peoria, Illinois. For all periods of time relevant to this Complaint, Caterpillar had many tens of thousands of employees.

### Jurisdiction and Venue

3.      Federal subject matter jurisdiction exists over this case pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 626 in that this case arises under federal law — specifically, the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. §§ 621 *et seq.* Jurisdiction over the breach of contract claim exists under both 28 U.S.C. § 1331 based on this Court's retention of jurisdiction to enforce that contract, and under the Court's supplemental jurisdiction, 28 U.S.C. § 1367.

4.      Venue lies in this District pursuant to 28 U.S.C. § 1391(a) in that all parties reside in this District and a substantial part of the events and omissions at issue in this case occurred in this District.

### Background Facts

5.      Plaintiff began working for Caterpillar in 1979, at the age of 19.

6.      Over the course of the first fourteen years of his employment there, plaintiff obtained an engineering degree, became a Caterpillar design engineer and, in 1993, received a promotion to Senior Design Engineer.

7.      In August 2000, plaintiff, who was then 41 years old, was demoted as part of a reclassification program in which the only five (of some 90) engineers whom Caterpillar failed to reclassify upward were older than 40 years of age.

8.      After plaintiff complained to his supervisors, and to senior management, that he felt that his demotion was a result of his age, his supervisors placed him on a performance improvement plan, and in November 2000, Caterpillar terminated him.

9. On September 28, 2001, plaintiff sued Caterpillar in this Court under the ADEA for age discrimination and for unlawful retaliation. *Murphy v. Caterpillar*, Case No. 01-cv-1402 (the "2001 Case").

10. Prior to a jury trial in April 2004, the Court granted summary judgment for Caterpillar on the age discrimination claim, but denied Caterpillar's motion for summary judgment on plaintiff's retaliation claim.

11. At the conclusion of the April 2004 jury trial, the jury (a) found Caterpillar liable for its termination of plaintiff, (b) found that Caterpillar's violation of the ADEA's anti-retaliation provisions was wanton and willful, and (c) awarded plaintiff twice his lost back pay.

12. At that point, the case returned to the Court for a determination as to whether plaintiff should receive front pay or reinstatement.

13. Caterpillar argued that the Court should award plaintiff a small amount of front pay, enter a purely monetary judgment for plaintiff and allow his termination to stand.

14. Plaintiff, on the other hand, asked the Court to order his reinstatement.

15. On October 26, 2004, the Court entered an Order directing that Caterpillar reinstate plaintiff.

16. In January 2005, plaintiff and Caterpillar entered into a confidential settlement agreement (the "Settlement Agreement") pursuant to which, among other things, (a) Caterpillar would reinstate plaintiff, (b) the case would be dismissed with prejudice, and (c) the Court would retain jurisdiction to enforce the

Settlement Agreement (which was filed under seal with the Court at the time of the entry of the dismissal order).

17. On January 20, 2005, the Court entered an Order dismissing the 2001 Case with prejudice and expressly retaining jurisdiction to enforce the terms of the Settlement Agreement.

18. Plaintiff returned to work at Caterpillar in January 2005.

19. From 2005 through 2017, plaintiff consistently performed his job at or above expectations, receiving bonuses and raises each year; in 2008 he received a salary grade promotion, with additional responsibilities and managerial authority.

20. In 2010, plaintiff's newly assigned manager (for reasons unrelated to plaintiff or his performance) was designated with the responsibility for preparing a presentation about plaintiff to celebrate plaintiff's 30-year anniversary with Caterpillar.

21. During the meeting between plaintiff and his new manager to prepare for the presentation, the manager asked plaintiff whether he was aware that there was a gap in his work history (for the period from his prior termination in November 2000 through the end of the 2001 Case in January 2005).

22. After plaintiff informed his manager — who had worked previously with the senior executive who had terminated plaintiff in November 2000 — that plaintiff did not want to discuss the reasons for the work history gap, his manager began treating plaintiff less favorably and unduly critically.

23. During 2016 and 2017, with plaintiff having been assigned to a new manager, Matt Rampenthal, plaintiff continued to perform his job successfully in all material respects.

24. For both years, Mr. Rampenthal, who was unaware at the time of the 2001 Case, prepared plaintiff's annual review, and rated plaintiff as meeting or exceeding expectations in every review category.

25. Then, in February 2018, Mr. Rampenthal and other managers from throughout Caterpillar's Industrial Power Systems attended a meeting in Seguin, Texas, to discuss their respective departments and employee teams.

26. Several managers and other participants at the meeting knew of plaintiff's 2001 Case against Caterpillar.

27. Toward the end of the four day meeting, while Mr. Rampenthal was still in Texas, Mr. Rampenthal began contacting plaintiff by email to inform him of sudden substantial alleged problems with his job performance.

28. Plaintiff's performance during January and February 2018, however, had remained at the same high level that he had been performing his job during 2016 and 2017.

29. In early March 2018, after Mr. Rampenthal had returned from the Texas meeting, he sent a third critical email to plaintiff, which again included concocted and non-existent performance problems.

30. At this point, plaintiff went to Mr. Rampenthal's office and challenged Mr. Rampenthal's criticisms, reminding him that, due to the nature of plaintiff's position and job responsibilities, Mr. Rampenthal often would not know the details (and successes) of the projects on which plaintiff was working.

31. During the meeting, Mr. Rampenthal acknowledged that a number of his criticisms of plaintiff were incorrect or overstated.

32. Indeed, on March 9, 2018, an engineering manager from another department sent an email to Mr. Rampenthal, among other managers, expressly recognizing plaintiff's exceptional teamwork on a critical project for which the other engineering manager (not Mr. Rampenthal) was principally responsible.

33. Still, shortly after plaintiff's early March meeting with Mr. Rampenthal, plaintiff decided — based on his experience when he was suddenly (and unlawfully) banned from Caterpillar's premises as part of his retaliatory discharge in 2000 — that he should print the three inexplicably hostile emails that Mr. Rampenthal had sent to him since the Texas senior manager meeting in February.

34. Yet, when plaintiff attempted to print the three emails, he discovered that Mr. Rampenthal had "recalled" them, and thus that plaintiff could no longer view or print them.

35. A week or so later, on March 16, 2018, Mr. Rampenthal and Ms. Heather Huber, of Human Resources, called plaintiff into a meeting among just the three of them.

36. During the meeting, Mr. Rampenthal and Ms. Huber informed plaintiff that, within the next several weeks, they would be placing plaintiff on a 90-day Action Plan (also known at Caterpillar as a Performance Improvement Plan, or PIP).

37. Under Caterpillar's internal disciplinary procedures, plaintiff's longevity with the company would have given him substantial appeal and other rights if Mr. Rampenthal sought to terminate or otherwise discipline plaintiff.

38. Yet, once plaintiff was placed on a PIP, Mr. Rampenthal could terminate plaintiff based on plaintiff's violation of any term of the PIP (including

alleged violations that were purely subjective in nature), and even based on plaintiff's failure, in Mr. Rampenthal subjective opinion, to improve his performance as required by the PIP.

39. In more than 30 years at Caterpillar, the only time plaintiff had been placed on a PIP was during the period that the jury had found that Caterpillar had wantonly and willfully retaliated against plaintiff for objecting to alleged age discrimination.

40. A week or so after the March 16 meeting, Ms. Huber provided plaintiff with a draft of the proposed Action Plan for his review and comments.

41. The Action Plan ran six pages and indicated <u>not</u> that plaintiff's performance needed improvement in a few areas of his job performance, which would have been untrue in any event, but that in the three months since the end of his successful 2017 performance, plaintiff now was failing to meet Caterpillar's expectations in essentially every aspect of his job.

42. The Action Plan further provided that if plaintiff failed to improve substantially in any (and every) aspect of his job performance, then the plan (and plaintiff) would be terminated prior to the end of the 90-day plan.

43. Both the premise and the requirements of virtually the entire draft Action Plan were absurd: plaintiff's performance had not changed one wit (at least not negatively) during the first three months of 2018, and the plan imposed requirements on plaintiff that would have impossible for any employee to accomplish.

44. Even a cursory review of the draft plan made clear that its purpose was to humiliate and demoralize plaintiff in the hope that he would resign, or to provide Mr. Rampenthal with the ability to terminate plaintiff at his whim.

45. Upon receiving a draft of the Action Plan, plaintiff was provided a short period to comment on and request changes to the plan.

46. Plaintiff suspected from the time of the March 16 meeting that he was being placed on an Action Plan as a cover for a predetermined decision by Mr. Rampenthal to eliminate plaintiff from Caterpillar.

47. Nevertheless, plaintiff opted to suspend his suspicions, to provide serious and thoughtful comments and proposed revisions to the Action Plan, and then to decide, based on the response to his comments and proposed revisions, whether Mr. Rampenthal and Ms. Huber already had decided to terminate him.

48. Unfortunately, Mr. Rampenthal and Ms. Huber accepted none of plaintiff's proposed revisions — not a single one — and on April 2, 2018, implemented the Action Plan precisely and word-for-word as they had originally drafted it. A copy of the fully signed Action Plan is attached hereto as Exhibit A.

49. The Action Plan was approved by senior officers of Caterpillar, including officers who knew of the 2001 Case.

50. At the time that plaintiff was placed on the PIP, Mr. Rampenthal and Ms. Huber already had determined that they would terminate plaintiff either during, or at the conclusion of the Plan.

51. Indeed, at the moment that plaintiff signed the Action Plan, on April 2, 2018, he was already in violation of the Plan, and subject to summary

dismissal, because (a) over plaintiff's express objections, the plan provided that, by no later than April 2, plaintiff had to have scheduled and calendared every one of the required bi-weekly review meetings with Mr. Rampenthal, (b) plaintiff and Mr. Rampenthal had not yet scheduled and calendared these meetings, and (c) plaintiff's failure to schedule or to attend a single one of these bi-weekly meetings, regardless of the reason, constituted grounds for his immediate termination,

52. At the time that Mr. Rampenthal and Ms. Huber placed plaintiff on the Action Plan, they were aware of plaintiff's age and of the 2001 Case.

53. The refusal of Mr. Rampenthal and Ms. Huber to make any revisions to the Action Plan removed any doubt in plaintiff's mind that the Action Plan was a precursor to plaintiff's termination.

54. At the time that plaintiff was placed on the PIP, he was eligible to retire with reduced pension rights and lifetime health insurance and related benefits.

55. On the other hand, if plaintiff were terminated during the course of or at the end of the plan, plaintiff would have to wait until he was 65 to begin collecting a pension, and would lose his lifetime health insurance and other retirement benefits for an employee of his extraordinary longevity with the company.

56. In view of the severe consequences to plaintiff of being terminated versus retiring, and plaintiff's determination that his termination was now a certainty, plaintiff began suffering depression, severe anxiety and panic attacks.

57. As a result, on April 2, 2018, plaintiff gave his retirement notice to Human Resources.

58. Because retirements must become effective as of the first day of a month, plaintiff's retirement did not become effective until May 1, 2018, but plaintiff had sufficient vacation time to take vacation from April 2 through May 1, 2018.

59. By submitting his retirement notice and then taking vacation from April 2 through May 1, plaintiff prevented Mr. Rampenthal from terminating him under the Action Plan and depriving him of the benefits that he had earned during his long and distinguished career with the company.

60. In view of the consequences to plaintiff of exposing himself to termination by working under the Action Plan from and after April 2, 2018, plaintiff was constructively discharged, and suffered an adverse employment action, as of that day.

61. On January 23, 2019, plaintiff faxed to the EEOC in Chicago, and the EEOC received, plaintiff's Charge of Discrimination alleging that the Action Plan, and plaintiff's corresponding constructive discharge, violated the age discrimination and anti-retaliation provisions of the ADEA.

62. On July 13, 2021, the EEOC issued plaintiff a Notice of Right to Sue, which gave him 90 days to bring suit against Caterpillar for the wrongdoing that plaintiff had alleged in the Charge.

63. Plaintiff has therefore exhausted his administrative remedies with respect to Counts I and II of this Complaint.

# CAUSES OF ACTION

## COUNT I
### *Violation of Section 623(a)(1) of the ADEA — Age Discrimination*
### (29 U.S.C. §623(a))

64. Plaintiff repeats and restates the foregoing Allegations Common to All Counts as if fully recited again here.

65. On the date of his constructive discharge (i.e., April 2, 2018), plaintiff was 58 years old.

66. On that date, Mr. Rampenthal and Ms. Huber knew plaintiff's age.

67. Mr. Rampenthal and Ms. Huber placed plaintiff on the Action Plan, with the intent of terminating him, because of his age.

68. Plaintiff has suffered substantial damages on account of Caterpillar's termination of him, including, among other things, lost pay, lost benefits, and other damages.

69. The constructive discharge of plaintiff due to his age was wanton and willful inasmuch as Mr. Rampenthal and Ms. Huber knew that terminating or otherwise mistreating plaintiff based on his age was unlawful.

70. On account of the foregoing, plaintiff is entitled to recover his lost back and front pay and punitive (i.e., double) damages from Caterpillars under the ADEA, and prays that the Court enter judgment for him, and against plaintiff, following a trial by jury, for such damages and related relief.

71. Plaintiff further prays that, on account of defendant's foregoing violations of the ADEA, the Court award plaintiff his attorneys' fees, professional fees and other costs and expenses of this suit.

## COUNT II
### *Violation of Section 623(d) of the ADEA — Discriminatory Retaliatory Termination*
### (29 U.S.C. § 623(d))

72. Plaintiff repeats and restates the Allegations Common to All Counts as if fully recited again here.

73. Caterpillar violated the anti-retaliation provisions of the ADEA by terminating plaintiff in retaliation for his 2001 Case against Caterpillar.

74. Plaintiff has suffered substantial damages as a result of Caterpillar's termination of him, including, among other things, lost back and front pay, lost benefits and other damages.

75. The constructive discharge of plaintiff due to his having brought the 2001 Case was wanton and willful inasmuch as Mr. Rampenthal and Ms. Huber knew that terminating or otherwise mistreating plaintiff in retaliation for exercising his rights under the ADEA was unlawful.

76. On account of the foregoing, plaintiff is entitled to recover back pay and front pay from Caterpillar as well as punitive damages to the extent provided by the act for wanton and willful violations thereof, and prays that, after a trial by jury, the Court enter judgment for him, and against Caterpillar for such damages.

77. Plaintiff further prays that, on account of the foregoing violation of the ADEA, the Court award him his attorneys' fees, professional fees and other costs and expenses of this suit.

## COUNT III
### *Breach of Contract*

78. Plaintiff repeats and restates the foregoing Allegations Common to All Counts as if fully recited again here.

79. Plaintiff further incorporates by reference the provisions of the Settlement Agreement that is on file with the Court in the First Case.

80. Due to the confidential nature of the Settlement Agreement, plaintiff is not identifying here the specific provision of the Agreement that Caterpillar breached by virtue of its above-stated conduct.

81. Nevertheless, Caterpillar is aware of the provisions that plaintiff's allegations, if true, would violate.

82. On account of the foregoing, plaintiff is entitled to recover compensatory damages, including lost back pay and front pay, and loss of pension benefits arising from plaintiff's forced retirement several years prior to his intended retirement from Caterpillar, and prays that the Court, following a trial by jury, enter judgment for him, and against Caterpillar, for such damages.

## CONCLUSION

WHEREFORE, plaintiff prays that, following a trial by jury, this Court enter judgment for plaintiff and against the defendant for back pay, front pay, and compensatory and punitive damages to the extent provided by the ADEA, as well as attorneys' fees, expenses and cost, and that the Court grant plaintiff such other and further relief as the Court may deem just and proper.

Dated: October 6, 2021

Respectfully submitted,

By: /s/ Jonathan A. Backman
      Jonathan A. Backman

Jonathan A. Backman (ID #6196243)
Law Office of Jonathan A. Backman
117 North Center Street
Bloomington, Illinois 61701-5001
(309) 820-7420
FAX: (309) 820-7430
jbackman@backlawoffice.com

*Attorney for Plaintiff Brian J. Murphy*