## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| BRIAN J. MURPHY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 21-cv-1282-JES |
| | ) |
| CATERPILLAR INC., | ) |
| | ) |
| Defendant. | ) |

### ORDER AND OPINION

This matter is now before the Court on Defendant Caterpillar Inc.'s ("CAT") Motion for Summary Judgment (Doc. 22), supported by a memorandum. Doc 23 (collectively, the "Motion"). Plaintiff Brian J. Murphy responded (Doc. 25, the "Response"), and CAT replied. Doc. 32 (the "Reply"). For the following reasons, the Motion is GRANTED in its entirety.[1]

### Material Facts[2]

Murphy, born on June 21, 1959, resides in the Village of Morton, Tazewell County, Illinois. Doc. 27-1 at 1.[3] CAT, one of "the world's leading manufacturer of construction and mining equipment, off-highway diesel and natural gas engines, industrial gas turbines and diesel-electric locomotives," is a corporation organized under the laws of the State of Delaware, with its

---

[1] Throughout the Order and Opinion, the Court cites the electronic pagination. However, the electronic pagination does not always track the page number printed on a particular submission.

[2] The Court has reviewed the voluminous record, consisting of approximately 840 pages of exhibits. However, some of the information contained within the record is duplicative, and when referencing a duplicated document, the Court refrains from including all possible citations.

[3] Three different exhibits are located in Doc. 27-1: It contains the Answer on pages 1 to 25, Defendant's Objections and Responses to Plaintiff's "Second Set of Request[sic] to Admit and Discovery Requests" on pages 26 to 47, and Defendant's Objections and Supplemental Responses to Plaintiff's Third Set of Discovery Requests on pages 48 to 53.

headquarters and principal operations located in Irving, Texas. Doc. 32-1 (CAT's FORM 8-K, Dated December 23, 2023). Murphy began his employment with CAT in 1979, at age 19.

Murphy obtained an engineering degree over his first fourteen years of employment with CAT, and in the mid-1990s, was promoted to Senior Design Engineer. *See* Doc. 26 (Murphy Decl.) at 1. On November 20, 2000, Murphy was working for CAT in Fuel Systems at the Pontiac Plant, *id.* at 2, where a string of events, immaterial to this action, led to his termination. Doc. 27-1 at 3.

In late 2001, Murphy filed a lawsuit in federal court, alleging age discrimination and retaliation. *See Murphy v. Caterpillar, Inc.*, JAG-01-1402, Doc. 1 (C.D. Ill. Sept. 28, 2001). That case proceeded to discovery, and the court subsequently granted CAT's motion for summary judgment as to Murphy's age discrimination claim, but permitted the retaliation claim to proceed to trial. *See id.,* Doc. 40 (Dated Mar. 26, 2004). At trial, the jury entered a verdict in Murphy's favor, *id.*, Doc. 46 (Dated Apr. 29, 2004), and the court ordered that he be reinstated. *See id.*, Doc. 71 (Dated Oct. 26, 2004). Then, in January 2005, the Parties entered into a "Release and Settlement Agreement." *See* Doc. 23-2 at 4-8 (the "Agreement").

Of relevance to the instant action, the Agreement contained an anti-retaliation provision, which states, Doc. 23-2 at 7:

> 6. **Other Agreements by MURPHY.** MURPHY also agrees that:
>
> [redacted]
>
> • his employment with CATERPILLAR will be "at-will" and can be terminated at any time by MURPHY and/or CATERPILLAR for any reason not prohibited by law; provided, however, that Caterpillar will not retaliate against MURPHY, by means of job conditions or locations, salary or other compensation, demotions or non-promotions, termination or otherwise, on account of (i) MURPHY'S commencement and pursuit of the Case, (ii) his statements or conduct during the Case, or (iii) his execution or enforcement of this Agreement.

Murphy was reinstated in January 2005, Doc. 27-1 at 5. From the time of his reinstatement in 2005 up until 2013, Murphy worked for several different supervisors, and was promoted to a Sound Program Leadership position in 2008. *See* Doc. 27-5 at 12-13 (Murphy's Chronological Job

History). Then, in January 2013, Matthew David Rampenthal became Murphy's new supervisor in the Industrial Power Systems Division. Doc. 23-6 at 2-6 (Rampenthal Decl.).

In June 2013, Rampenthal became aware of two inappropriate comments allegedly made by Murphy at around that time. *See* Doc. 23-7 at 21-24 (Rampenthal's Desk Notes Dated June 10, 2013). As to the first comment, Murphy questioned a coworker who participated in jury selection for a criminal drug case as to whether the defendant was African American. *Id.;* Doc. 23-1 at 2-78 (Murphy Depo.), *id.* at 27; Doc. 23-6 at 12. The second comment involves Murphy's statement in a meeting as to how women like to ride Harley Davidson motorcycles due to the vibrations. Doc. 23-6 at 8-11 (Rampenthal's Desk Notes Dated June 27, 2013); Doc. 23-7 at 21-24. Murphy initially denied making any statement concerning Harley Davidson motorcycles and women. Doc. 23-6 at 12. But, at his deposition, Murphy admitted to saying, "maybe we can have our own signature vibration" and "I hear some women like second gear on Harley Davidson." Doc. 23-1 at 24.

Upon investigation of these statements, Rampenthal engaged Murphy's prior supervisor, Jim Sibley, in a dialogue. Doc. 23-7 at 21-24. Sibley told Rampenthal that Murphy had previously made an offensive comment about "fondling parts" in the presence of a female assistant. *Id.* At his deposition, Murphy clarified this comment, Doc. 23-1 at 25: "I just said to her as I was leaving because when I tap on a keyboard I kind of pound keys, and she just very lightly touches those. And so I said I'll let you get back to fondling, meaning touching gently and lightly, your keyboard." It was around this time that Rampenthal learned from Sibley of Murphy's 2001 lawsuit and 2005 reinstatement. *See* Doc. 27-3 (Rampenthal Depo.) at 13-15.

Due to Murphy's alleged comments and employment history and the prior lawsuit, Rampenthal set up a discussion with Human Resources ("HR") employee, Andrew Konsky, to determine how to proceed. Doc. 23-7 at 21-24. Konsky indicated that he would support a

performance improvement plan (otherwise referred to as a "PIP," "action plan," "Did not Meet Performance Expectation Plan," and "plan") based on Murphy's confirmed inappropriate remark, and also his performance – noting that even though Murphy may be meeting his goals it is unacceptable to do so in a disruptive fashion. *Id.*; Doc. 27-3 at 71-73. Ultimately, Rampenthal did not pursue an action plan, and instead, Murphy was required to complete "Prohibited Harassment" training. Doc. 23-6 at 2.

After these incidents, Rampenthal appeared satisfied with Murphy's performance and conduct for quite some time. *See, e.g.*, Doc. 26-1 at 8. Indeed, Murphy's performance reviews for years 2013 to 2017 indicate that he either met or exceeded Rampenthal's expectations. *See* Doc. 27-8 (Murphy's 2013 Performance Review); Doc. 27-9 (Murphy's 2014 Performance Review); Doc. 27-10 (Murphy's 2015 Performance Review); Doc. 27-11 (Murphy's 2016 Performance Review); Doc. 23-3 at 8-22 (Murphy's 2017 Performance Review). [4] It was not until late 2017 that Rampenthal began to consider remedial measures in connection with Murphy's performance.

On January 11, 2018, Murphy notified Rampenthal of a tooling access issue with one of his projects. Doc. 23-2 at 9-11. In response, Rampenthal emailed Murphy questioning why the issue was not identified and fixed at an earlier time, and Rampenthal also emphasized that Murphy was ultimately accountable for the project. *Id.; see also* Doc. 23-6 at 3. Of note, Huber was blind copied on Rampenthal's email to Murphy (as well as several subsequent emails), as she was already aware of Rampenthal's concerns with Murphy's performance, and she recommended that Rampenthal clearly articulate his expectations. Doc. 27-2 at 53-54; Doc. 27-3 at 29-30.

---

[4] Notably, performance reviews are not finalized until March of the following year, so Murphy's 2017 review was finalized in March 2018, etc. *See* Doc. 27-2 (Huber Depo.) at 27. Heather Huber served as a Human Resources ("HR") manager, and she began to work with Rampenthal's division in October 2017. *See id.* at 45; Doc. 23-5 at 2-4 (Huber. Decl.).

In February 2018, more issues surfaced that caused Rampenthal to question Murphy's performance. Doc. 23-6 at 3-4. Rampenthal discovered a high-risk fuel line failure, as well as several smaller issues, on one of Murphy's other projects. Doc. 23-2 at 12-13. Rampenthal also learned of a delay in a new product introduction that was under Murphy's ambit. When Rampenthal asked about Murphy's plans to address the issue, Murphy suggested that Rampenthal should hire more people. *Id.* at 14-15. Rampenthal then reminded Murphy to be aware of project delays and hold appropriate discussions to ensure the issue is properly resolved. *Id.*

Prompted, in part, by Murphy's suggestion as to the need for additional personnel, Rampenthal directed Huber to curate Murphy's badge report to the time Murphy spent in any Caterpillar building, from October 2017 to February 2018. *See* Doc. 23-5 at 37-76. The report showed that Murphy was working less than forty hours every week. *Id.* at 3.

Rampenthal met with Murphy several days later, on March 2, 2018, to discuss his ongoing projects. Doc. 23-6 at 4. At the meeting Murphy was informed that he was accountable for the work of the "job owners" under him, and that it was his responsibility to ensure that his job owners had the necessary support and resources. Doc. 23-6 at 20-21 (Rampenthal's Desk Notes Dated March 2, 2018); *see also* Doc. 27-2 at 35 ("Owning at Caterpillar means that you take responsibility and accountability for whatever that may be that you own."). Additionally, Rampenthal conveyed his concern that Murphy was not working enough hours. Doc. 23-6 at 4. On March 5, 2018, Rampenthal shared the badge reports with Murphy. Doc. 23-2 at 18.

Shortly after, on March 8, 2018, Murphy met with Rampenthal to discuss the 2017 Final Performance Review. Doc. 23-6 at 4. In that meeting, Rampenthal praised Murphy's technical skill, but also highlighted issues around job implementation, leadership style, and attendance. *Id.* at 22 (Rampenthal's Desk Notes Dated March 8, 2018); *but see* Doc. 23-1 at 49 (Murphy denies

that Rampenthal commented on his leadership and implementation efforts). Murphy explained his low hours by noting that he was entitled to a 15-minute break every four hours, which meant that he was only required to work 37.5 hours a week. Doc. 23-6 at 22.[5] When Murphy was asked whether he worked after hours at home, he responded, Doc. 23-1 at 49: "I typically do not work from home because I'm rest[sic] and recharging to, you know, give it my all the next day."

The following day, March 9, 2018, Rampenthal scheduled a March 12, 2018, meeting with Huber to discuss placing Murphy on an action plan. *See* Doc. 23-6 at 24 (Rampenthal's Desk Notes Dated March 9, 2018). During that meeting, Rampenthal decided to put Murphy on an action plan. Doc. 27-2 at 74-75. Two days later, on March 14, 2018, Rampenthal became aware (Doc. 23-6 at 5) of an inappropriate remark made by Murphy to Simon Tseng (*i.e.*, one of the job owners under Murphy). Murphy had commented that of his four job owners, the two of Asians descent were "late on their release." Doc. 23-1 at 50. Murphy also referred to Tseng as his "little job owner." *Id.*

Several days later, on March 16, 2018, Rampenthal and Huber met with Murphy and informed him that he would be placed on an action plan. Doc. 27-3 at 11.[6] At the meeting, Rampenthal shared a PowerPoint presentation that highlighted a few areas of concern, including

---

[5] Rampenthal, however, confirmed with Huber on March 13, 2018, that no such policy existed. Doc. 23-6 at 22-23.

[6] Seemingly due to being placed on a PIP, Murphy began to experience anxiety and depression. *See* Doc. 27-13. However, it is unclear as to how this is relevant to Murphy's case, as damages are not an issue given the Court's disposition of the Motion. Nor is anxiety in and of itself a helpful tool in evaluating Murphy's claim, as it seems that a reasonable person might well experience anxiety upon learning of his employer's decision to plan him on a PIP. Furthermore, the medical records contain highly sensitive and confidential medical information. Therefore, although Murphy submitted these records, and neither party petitioned the Court to seal the records, under the circumstances, the Court believes sealing is appropriate. *See Chapman v. Raemisch*, LA-05-1254, 2009 WL 425813, at *7 (E.D. Wis. Feb. 20, 2009) (sealing medical records that are not "so relevant to plaintiff's claim…"). And so, the Court, *sua sponte*, DIRECTS the Clerk to SEAL Murphy's medical records (Doc. 27-13).

Murphy's job performance, attendance, interpersonal relationships, and leadership style. *See* Doc. 27-5 at 29-33; Doc. 23-6 at 28-29 (Rampenthal's Desk Notes Dated March 16, 2018). That day, Murphy requested a copy of the presentation, and Huber delivered it to him on March 21, 2018. Doc. 23-3 at 23-24. Also on March 21, 2018, Murphy met with Jeff Bruce and Rampenthal to discuss the challenges in the cartridge filter assembly project in Seguin, Texas, and Rampenthal expressed concerns as to Murphy's willingness to take on a leadership role and to drive implementation efforts. Doc. 23-6 at 30 (Rampenthal's Desk Noted Dated March 21, 2018).

On March 26, 2018, Murphy met with Rampenthal and Huber to review the proposed action plan. Doc. 23-1 at 61. The action plan (discussed *infra*) set several categories for improvement, based on a "noticeable change" in Murphy's performance over the three months prior, including the areas discussed in the PowerPoint deck. Doc. 23-4 at 5-10.[7] Additionally, the plan clearly stated that Murphy's "failure to successfully complete and sustain Improvement on the action ltem(s) listed above could result in reassignment, demotion, and/or disciplinary action, up to and including separation. *Id*. The next day, Rampenthal sent Murphy a copy of the plan, requesting that Murphy identify any "concerns" by 3:00 pm on March 28, and Rampenthal stated that they would work to execute a plan "…once all three of us are in alignment…" Doc. 23-4 at 4.

On March 28, 2018, at 2:30 pm, Murphy sent Rampenthal and Huber an email with his comments and concerns as to the plan. Doc. 27-2 at 30-31; Doc. 23-4 at 12-13. The next morning, Huber replied to Murphy, copying Rampenthal, indicating that they would "not be changing any part of the action plan." Doc. 23-4 at 11. Around this time, Murphy raised the possibility of his

---

[7] The action plan contains a fifth category, which indicates that Murphy should take steps to find a position in a different division. *See* Doc. 27-5 at 40. However, this action item was included based on Murphy's request, and is not relevant to whether he was meeting Rampenthal's expectations as to performance at the time the plan was to be executed. Rather, the "performance" aspect of this category creates prospective expectations that were not previously applicable.

retirement with Huber. Huber replied that Murphy would be able to retire in lieu of meeting the plan's requirements. Doc. 23-1 at 322-23; Doc. 27-2 at 65-66.[8]

On March 29, 2018, Huber delivered a copy of the final action plan to Murphy, which, as noted, was the same as the proposed action plan. Doc. 23-1 at 69. On March 29, 2018, the plan was signed by Huber and Jeffrey Moore (*i.e.*, Rampenthal's supervisor, *see* Doc. 27-3 at 19-20). Doc. 27-5 at 42. Rampenthal signed the plan on April 2, 2018, and although Murphy did not sign the signature box of the plan on April 2, 2018, he signed the last page of the document, indicated that it was received, and specifically noted that his signature should not be construed to signal that he agreed with the allegations in the plan or the process in which it was created. *Id.* Rather than proceeding with the plan, Murphy chose to retire, and he gave his notice on April 2, 2018. Doc. Doc. 23-4 at 14. Murphy utilized his saved vacation days, so that his last day was April 30, 2018, and his retirement was effective as of May 1, 2018. *Id.* at 15-16.

Approximately ten months later, Murphy filed a charge with the EEOC, alleging retaliation and age discrimination. Doc. 27-4 at 2. Murphy asserted he was placed on a performance plan based on "minor, cherry-picked negative comments" in prior reviews, despite positive performance evaluations from previous years; and that this was done as a precursor to terminating him due to his increasing age and in retaliation for his 2001 lawsuit. *Id.* Murphy indicated that he received his notice of right-to-sue letter from the EEOC on July 13, 2021, and has therefore exhausted his administrative remedies. *See* Doc. 1 at 10.

Murphy filed the suit *sub judice* on October 6, 2021. *See* Doc. 1 (the "Complaint"). In it, he alleges that CAT discriminated against him on the basis of his age (Count I) in violation of the

---

[8] Murphy also sent Huber an email asking for written confirmation that he would be eligible to retire if he did not satisfy the action plan. Doc. 26-2 at 4. At her deposition, Huber did not recall such a request. Doc. 27-2 at 67.

Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. §§ 621 *et seq*. He also alleges

retaliation in violation of the ADEA (Count II) and the Agreement (Count III). As to relief, Murphy

seeks, *inter alia*, front pay, back pay, and punitive damages.

## Motion for Summary Judgment[9]

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant if entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When presented with a

motion for summary judgment, the Court must construe the record "in the light most favorable to

the nonmovant and avoid[] the temptation to decide which party's version of the facts is more

likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The moving party has the burden

of providing proper documentary evidence to show the absence of a genuine issue of material fact.

---

[9] The Court acknowledges CAT's qualm with Murphy's alleged failure to strictly adhere to Rule 56 and Local Rule 7.1(D). *See* Doc. 32 at 4-6. However, Murphy's Response is not so substantively or formulaically deficient as to require the Court to consider undisputed CAT's Statement of Undisputed Material Facts. Furthermore, CAT's statements of disputed and additional facts are not visions of clarity. For example, CAT cites *Russell v. Village of Dolton*, RWG-21-4908, 2023 WL 5748374, *7 (N.D. Ill. Sep. 6, 2023), on twenty-nine separate occasions, and repeats the same quote, *id.* at 7, "plaintiff cannot rely on inadmissible hearsay to defeat summary judgment," twenty-five times. CAT also cites *Basta v. American Hotel Register Co.*, 872 F. Supp. 2d 694, 700 (N.D. Ill. 2012), fifty-eight times, without even utilizing a short form citation. It is especially frustrating to the Court that CAT repeatedly asserts that Murphy's additional facts contain conclusory statements or impermissible legal or factual arguments, while CAT fails to detail which statements it refers to. The pot should refrain from calling the kettle black.

Regardless, "[d]istrict courts have 'considerable discretion in interpreting and applying their local rules….'" *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 549 (7th Cir. 2017) (quoting *Dr. Robert L. Meinders, D.C., Ltd. v. UnitedHealthcare, Inc.*, 800 F.3d 853, 858 (7th Cir. 2015) in turn quoting *Cuevas v. United States*, 317 F.3d 751, 752 (7th Cir. 2003)). Additionally, the Court is free to consider the record outside the Parties' briefings, *Latko v. Cox*, No. 20-2634, 2021 WL 5234863, at *2 (7th Cir. Nov. 10, 2021), and "is confident in its ability to understand which material facts are actually in dispute, as supported by the record." *White v. Felchner*, SEM-19-3181, 2021 WL 3223067, at *2 (C.D. Ill. July 29, 2021). Thus, the Court need not admonish or sanction Murphy in connection with his briefing.

*Celotex Corp.*, 477 U.S. at 323-24. Once a properly supported motion for summary judgment is filed, the burden shifts to the non-moving party to demonstrate with specific evidence that a triable issue of fact remains for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). The party opposing summary judgment "must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

However, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there is a genuine triable issue; he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, though a court must "construe all inferences in [a] non-movant's favor, [] he is not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing *Nichols v. Mich. City Plant Planning Dept.*, 755 F.3d 594, 599 (7th Cir. 2014)). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### Discussion

Murphy alleges that CAT is liable under the ADEA for retaliation and age discrimination, and also that CAT is liable for breach of contract in connection with the Agreement. *See* Doc. 1. As discussed in greater detail below, CAT primarily moves for summary judgment as to all of these claims on the basis that 1) Murphy's performance was not meeting CAT's legitimate expectations, 2) Murphy has not pointed to any evidence of age discrimination, and 3) the

prolonged time between the execution of the Agreement in 2005 and Murphy's termination in 2018 undermines any causation between the two events.

Discrimination (Count I)

"The ADEA protects workers 40 years of age and older from age-based employment discrimination." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018). "However, 'in the ADEA context, it's not enough to show that age was a motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred.'" *Hoffberg v. Elliot Auto Supply Co., Inc.*, LCJ-21-5063, 2024 WL 245186, at *6 (N.D. Ill. Jan. 23, 2024) (quoting *Martino v. MCI Commc'ns Serv., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009)). Of relevance here, "negative performance reviews and performance improvement plans" do not "constitute adverse employment actions." *Fields v. Bd. of Ed. Of City of Chi.*, 928 F.3d 622, 626 (7th Cir. 2019) (citations omitted); *see also Swenson v. Bd. of Educ. of City of Chi.*, MMR-20-6558, 2023 WL 4352104, at *4 (N.D. Ill. July 5, 2023) ("'[A] negative evaluation or admonishment by an employer does not rise to the level of an adverse employment act.'") (quoting *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004)).

"Although there are many tests and rubrics for viewing discrimination claims, it is important to recall that, at the end of the day they are all merely convenient ways to organize our thoughts as we answer the only question that matters: when looking at the evidence as a whole, 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)); *see also Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).

One method a plaintiff may utilize to present this evidence is the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367–68 (7th Cir. 2019). Under this approach, "[t]o set forth a *prima facie* case of age discrimination [], an employee must show that: (1) he was over forty years of age; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated, substantially younger employees were treated more favorably." *Cabrera v. Advance Pallet, Inc.*, JCD-20-6750, 2023 WL 6276542, at *3 (N.D. Ill. Sept. 26, 2023) (citing *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771–72 (7th Cir. 2002)).[10] "The law defines substantially younger as 'generally ten years younger.'" *Torbica v. Horizon Bank*, DRL-22-20, 2023 WL 7214939, at *5 (N.D. Ind. Nov. 2, 2023) (quoting *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 322 (7th Cir. 2003)).

"If the plaintiff meets each element of h[is] prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 719-20 (7th Cir. 2018)

---

[10] Seventh Circuit case law on the fourth element of a *prima facie* case of age discrimination is not entirely clear. A few Seventh Circuit cases recite that element as requiring favorable treatment of employees outside the protected class. *See, e.g., Phillipson v. Wolf*, 831 F. App'x. 212, 216 (7th Cir. Oct 21, 2020). Others require that the individual be substantially younger than the plaintiff. *See, e.g., Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 609 (7th Cir. 2012). Finally, some cases only note that the comparator must be younger, refusing to apply a bright-line test to the age difference between a plaintiff and comparator. *See, e.g., Kralman v. Illinois Dept. of Veterans' Affairs*, 23 F.3d 150, 155 (7th Cir. 1994). Nevertheless, this element is not dispositive of Murphy's claim, as *Ortiz* renders any analysis of the *prima facie* case to be nothing more than a useful exercise for the Court in holistically evaluating the record evidence as it relates to age discrimination. Furthermore, the Parties appear to agree that the two other engineering job team leaders, Chris Swanson (age 43) and Bruce (age 54) are appropriate comparators, so the Court refrains from delving further into the issue. *See* Doc. 25 at 85; Doc. 32 at 139.

(citation omitted). Although "[a] plaintiff may put forth and a court may analyze evidence using the *McDonnell Douglas* framework, [] neither must do so." *Tyburski v. City of Chi.*, 964 F.3d 590, 598 (7th Cir. 2020) (citation omitted). Here, the Court utilizes "the *McDonnell Douglas* framework as a supplemental tool." *Id.* at 599.

The Parties agree that, at all relevant times, Murphy, at age 58, was a member of the class sought to be protected by the ADEA. The Parties disagree as to whether Murphy 1) suffered an adverse employment action, 2) was meeting legitimate performance expectations, and 3) was treated worse than similarly situated employees. The Court now turns to the dispute concerning Murphy's adverse employment action, that is, whether he was constructively discharged.

A plaintiff can typically show constructive discharge in two ways. *See Ziccarelli v. Dart*, 35 F.4th 1079, 1091 (7th Cir. 2022) (citation omitted). Under the first, a plaintiff must "demonstrate a discriminatory work environment even more egregious than the high standard for hostile work environment." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008). Under the second, a plaintiff must show that he was forced to resign because his "working conditions [became] so intolerable that a reasonable person would have felt compelled to resign." *Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225 (7th Cir. 2022) (citation omitted). Murphy admits to proceeding under the second approach. *See* Doc. 25 at 70. Thus, the determination of whether Murphy was constructively discharged turns on whether his working conditions were intolerable.

"Working conditions become intolerable when an employer acts in a manner so as to have communicated to a reasonable employee that []he will be terminated, and the employee resigns. In other words, constructive discharge occurs where, based on an employer's actions, the handwriting was on the wall and the axe was about to fall." *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1119 (7th Cir. 2022) (citation, quotation, and alteration omitted); *see also Hunt v. City of*

*Markham*, 219 F.3d 649, 655 (7th Cir. 2000) ("A person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with his employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable."). However, a "working condition does not become intolerable or unbearable merely because a prospect of discharge lurks in the background." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (quotation and citation omitted); *see also Wright v. Ill. Dep't of Child. & Fam. Servs.*, 798 F.3d 513, 523 (7th Cir. 2015) ("…an employee did not demonstrate that she was discharged constructively when she received notice of her employer's intent to commence a process that could lead to her discharge and 'the employer [did] not undermine the employee's position, perquisites, or dignity in the interim.'") (quoting *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004)).

The Parties' briefing on this issue is disconnected, with CAT failing to address the important points raised by Murphy. Murphy primarily argues that the circumstances leading up to the implementation of the action plan rendered his termination a foregone conclusion. Doc. 25 at 68-73. He points to, *inter alia*, CAT's refusal to incorporate any of his suggested edits into the plan, CAT management signing the action plan as though Murphy was unsuccessful, and the action plan containing deadlines that Murphy would have already failed to meet the moment the plan took effect. CAT does not address these factors, and instead argues in the Motion (and asserted again in the Reply) that Murphy has not cited evidence to support an inevitable termination, and the Court should not speculate as to whether Murphy could have satisfied the plan. Perhaps CAT's omission is a concession to the weakness of its argument and the strength of Murphy's position.

The record shows that the plan required Murphy to "assemble each of the primary teams/ groups Impacted by the Seguin sourcing plans" by March 28, 2018, *see* Doc. 27-5 at 38, *i.e.*, several days before the action plan was to take effect. Murphy asserts that as of March 29, 2018, when he emailed Huber with his edits, he was already in violation of this requirement. Doc. 25 at 72. A jury could find that Murphy's unavoidable violation of the plan to be indicative of his inevitable termination. Similarly, a jury could reasonably infer that Murphy's discharge was inescapable due to Huber and Rampenthal failing to implement any of Murphy's suggested changes to the plan. *See* Doc. 27-5 at 34-36.[11] In particular, a jury may find significance in Huber's deposition testimony, where she answered "no" upon being asked whether Murphy's proposed changes "seemed unprofessional or not designed to in his view improve the action plan." Doc. 27-2 at 32-33.

Yet, even more potent is the effect of CAT's management and HR signing the plan. The record shows that Rampenthal signed the plan on April 2, 2018, and Huber and Moore signed the plan on March 29, 2018. Doc. 27-5 at 42. The signatures are displayed on the plan as follows, *id.*:



Huber testified that all action plans are signed in such a manner on the date, or as close to the date as possible, that a plan is executed. Doc. 27-2 at 29-30. Yet, CAT also admitted, with

---

[11] For example, as discussed *supra*, the plan required Murphy to look for opportunities in other divisions and report back to Rampenthal. However, the plan also indicated that it would be filed in Murphy's employment history folder, and so Murphy's email expressed concern that it would be challenging for him to find other opportunities if his history folder shows a pending action plan. However, the plan did not require him to actually obtain a new position, so he could have satisfied this aspect of the plan merely by pursuing other opportunities.

regard to another employee, "that the signature block at the end of the Final Atkins Action Plan contains no signatures because Greg Atkins satisfied the terms and conditions of his plan." Doc. 27-1 at 31.[12] Indeed, Atkins successfully completed his plan and there are no signatures. *See* Doc. 29 (Atkins's Plan) at 8. Thus, a reasonable jury may find that CAT's inconsistent practice as to whether and why it requires signatures in the above-inserted signature box suggests that CAT predetermined Murphy's fate.

In light of the foregoing, at this stage of litigation where the Court must view all reasonable inferences in favor of Murphy as the nonmovant, a dispute of material fact exists as to whether he was constructively discharged.[13] For the purposes of summary judgment, Murphy has suffered an

---

[12] Greg Atkins, born in 1981, was placed on an action plan by Rampenthal and Huber. Doc. 23-5 at 3; Doc. 23-6 at 5. Atkins appears to have worked with Murphy, but the extent of their relationship is not clear. *See* Doc. 23-6 at 26; Doc. 26-1 at 32.

[13] Murphy filed his charge with the EEOC on January 23, 2023. *See* Doc. 27-4 at 2. CAT argues that Murphy's ADEA claims are barred by the statute of limitations, since he was notified of CAT's decision to place him on a PIP on March 16, 2018, and therefore, because the EEOC limitations period began to run on that date, the charge was untimely filed. *See* Doc. 23 at 23-25. Murphy argues that the limitations period began on March 29, 2023, because, for the reasons discussed, that was the date of his constructive discharge. *See* Doc. 25 at 73-76. CAT did not address the statute of limitations in the Reply.

It is true that, in Illinois, a complainant must file a charge with the EEOC within 300 days of the adverse employment practice, otherwise the charge will be untimely and barred. *See Ford v. Becton, Dickenson and Company*, JPG-20-1315, 2021 WL 1720273, at *3 (S.D. Ill. Apr. 30, 2021) (citations omitted). "With claims of either constructive discharge or actual discharge, the standard rule thus yields the same result: a limitations period should not begin to run until after the discharge itself." *Green v. Brennan*, 578 U.S. 547, 556 (2016). Thus, the limitations period began to run on March 29, 2023, and therefore Murphy's EEOC charge was timely filed. *See, e.g.*, *Brownlee v. Catholic Charities of the Archdiocese of Chi.*, JBG-16-665, 2020 WL 977968, at *5 (N.D. Ill. Feb. 28, 2020) (holding that plaintiff's constructive discharge claim accrued when the employer was given notice of resignation).

Relatedly, the right-to-sue letter is not in the record, although CAT does not argue that Murphy failed to exhaust his administrative remedies. Indeed, such an argument would likely be frivolous, as CAT's response to the EEOC investigation is in the record. *See* Doc. 27-5 at 1-8.

adverse employment action, *i.e.*, the third element of his *prima facie* case.[14] The Court now turns

to the remaining elements of Murphy's *prima facie* case – all of which blend together.

Here, CAT's justification for any adverse employment action is that Murphy was failing

to meet CAT's legitimate performance expectations. Doc. 23 at 30-32. Relatedly, CAT also argues

(Doc. 32 at 139) that Murphy's comparators, Swanson and Bruce, are not similarly situated

because they were meeting legitimate performance expectations. *See Fuqua v. Brennan*, 645 F.

App'x. 519, 523 (7th Cir. 2016) ("'...comparators must be similar enough that differences in their

treatment cannot be explained by other variables, such as distinctions in their roles or **performance**

**histories**.'") (emphasis added) (quoting *Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009)).

Accordingly, the court may skip a *McDonnell Douglas* analysis as to the second and fourth

elements as "the issue of meeting legitimate job expectations and the question of pretext overlap."

*Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 463 (7th Cir. 2014) (citing *Collins v. Am. Red

Cross*, 715 F.3d 994, 1000 (7th Cir. 2013)); *see also Vichio v. US Foods, Inc.*, 88 F.4th 687, 691

(7th Cir. 2023). Thus, the Court must assess whether Rampenthal's assessment of Murphy's

performance was pretextual.

"To be pretextual, the reason must be 'a lie, specifically a phony reason for some action.'"

*Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 646 (7th Cir. 2023) (quoting *Chatman v. Bd. of

Educ. of Chi.*, 5 F.4th 738, 746 (7th Cir. 2021) in turn quoting *Russell v. Acme-Evans Co.*, 51 F.3d

64, 68 (7th Cir. 1995)). The Seventh Circuit has also referred to pretext as "'deceit used to cover

---

[14] The Parties dance around the issue of the importance and truthfulness of Murphy's belief that if he were terminated, he would not be entitled to certain benefits. But, for the purposes of establishing constructive discharge, this is irrelevant. *See, e.g.*, *Allen v. Baltimore Cnty Bd. of Educ.*, ELH-21-1006, 2023 WL 5352416, at *18 n.20 (D. Md. Aug. 21, 2023). The important consideration is whether termination was inevitable, not whether termination would necessarily encompass ancillary detrimental effects.

one's tracks.'" *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) quoting *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001) in turn quoting *Kulumani v. Blue Cross Blue Shield Ass'n.*, 224 F.3d 681, 685 (7th Cir. 2000)).

"The plaintiff can establish pretext by showing that the employer's proffered explanations: (i) were factually baseless; (ii) were not the actual motivations for [termination]; or (iii) were insufficient to motivate the [termination]." *Yancey v. Ascension Health Alliance, Inc.*, SEB-21-2678, 2023 WL 6316721, at *10 (S.D. Ind. Sept. 28, 2023) (citing *Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir. 1999)). "What's more, 'a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus.'" *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 573 (7th Cir. 2021) (quoting *Hitchcock v. Angel Corps., Inc.*, 718 F.3d 733, 740 (7th Cir. 2013) in turn citing *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir.2010)); *see also Xiong v. Bd. of Regents of the Univ. of Wis. Sys.*, 62 F.4th 350, 353–54 (7th Cir. 2023); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014). Specifically, the "plaintiff 'must identify such weaknesses, implausibilities, inconsistencies, or contradictions' in the employer's asserted 'reasons that a reasonable person could find it unworthy of credence.'" *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711 (7th Cir. 2021) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

Of relevance here, the Seventh Circuit has stated "in more than one hundred reported opinions" that a district court is "not a super-personnel department that [can] substitute [its] criteria for an employer's for hiring, promoting, or disciplining employees." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 933 (7th Cir. 2020) (citations omitted). Rather, "[i]n order to determine whether [Murphy] was meeting his employer's legitimate expectations, '[t]he proper inquiry mandates looking at [Murphy's] job performance through the eyes of [his] supervisors at the time of [his] ...

termination.'" *Harper v. C.R. England, Inc.*, 687 F.3d 297, 310 (7th Cir. 2012) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008)). "'The question is not whether the [employer's performance] ratings were *right* but whether the employer's description of its reasons is *honest*.'" *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 574 (7th Cir. 2021) (quoting *Gustovich v. AT & T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992)).

The Court now reviews Rampenthal's concerns regarding Murphy's performance, as illustrated in the plan, with the above-cited legal principles in mind. As noted, the plan consists of four improvement categories that are based on Murphy's past performance, including leadership style, job performance, attendance, and values-based competency. The Court first discusses the plan as to leadership and job performance in combination, as the two areas of improvement are inextricably intertwined.

Regarding leadership, the plan stated, Doc. 27-5 at 37:

**1. Operational Excellence -- EAC Releasing (Deliver EDS / MCS Releases of all EAC's in a timely fashion to meet negotiated engine 'At Customer' dates. Hold Design Reviews in a timely fashion consistent with meeting NPI Program Deliverables)**

**Needs Improvement:** Leadership
Overall experience & understanding of the job implementation process to meet customer release and build dates is necessary. Brian is comfortable with the technical details of a job change / NPI / CPI issue resolution. He needs to not only provide technical support, but he has to guide, mentor, and coach his Job Ownership team to ensure job implementation without late changes, risks and project roadblocks.

With respect to job responsibilities, the plan provided, Doc. 27-5 at 38:

**2. Expanded Offerings -- NPI Deliverables (Drive product quality, performance, and margin improvements across the markets we serve - beyond our core Industrial and Machine market customers.)**

**Needs Improvement:** Job Responsibilities
Brian has primarily been working in a Technical Support role for the implementation of Cartridge Filters (Next Generation filtration for oil and fuel filtration). He has been the primary Core Engine technical lead on the program since at least 2013. In 2016, Brian was asked to lead the implementation efforts into Seguin for this hardware (implementation ownership for all of our 9.3L applications implementing Cartridge Filtration). Seguin is not as well equipped to take on this installation effort, and Platform Leadership is required.

19

Given the nature of Murphy's complex work for a sophisticated company such as CAT, the Court attempts to distill the complicated nature of Murphy's performance issues, as perceived by Rampenthal, with the use of layman-friendly language.

Murphy supervised and mentored job owners (described *supra*), and was ultimately accountable for their work product. Murphy's approach to leadership was to act as an "Oak Tree," that is, "to provide technical support and guidance [] when asked." Doc. 23-6 at 22. To this end, Murphy did not have a working knowledge of his job owners' projects, and was notified when problems arose. *Id.* at 20. Additionally, when asked about issues with a project, rather than taking responsibility, Murphy would refer Rampenthal to speak to the individual job owner assigned to the task (*i.e.*, assign "blame"), rather than to take responsibility for the problem. *Id.* Additionally, Bruce had to step in and provide coaching to Murphy's job owners. *Id.* at 30. Murphy's lack of mastery over the nuances of his job owners' projects created issues at the implementation stage of production, resulting in delays. *Id.* at 19, 20. This issue came to a head when Brandon Nuehoff, one of Murphy's job owners, transferred to a different department in February 2018. *Id.* at 28. Because Murphy did not have a grasp of Nuehoff's projects, or a timely transition plan in place, there were issues with moving Neuhoff's assignments to other job owners under Murphy. *Id.* at 28.[15] Finally, despite Murphy having "the most depth and experience relative to Cartridge Filter design," he was "reluctant to assume" a leadership role in that area. *Id.* at 30.

The Court need not rehash its earlier discussion as to the delays and implementation failures that Rampenthal attributed to Murphy, as there are additional cases that further illustrate

---

[15] On February 26, 2018, Rampenthal directed Murphy to conduct transition meetings with Nuehoff and two other job owners who would be assuming Nuehoff's projects. Doc. 23-2 at 16-17. CAT appears to reference this email to argue that Murphy needed to be prompted multiple times to conduct the transition. Doc. 23-1 at 43. However, no evidence supports this argument.

Rampenthal's concerns. For instance, the PowerPoint presentation that was provided to Murphy, and discussed with him on March 16, 2018, detailed precise examples of his performance deficiencies. As to leadership, the presentation referenced a 50-day delay with the "140 MG Bridge Production Releasing" and that "HEU/ CPI issue resolution PRC requirements and expectations were not highlighted as a risk in late-2017 / early-2018." Doc. 27-5 at 30. Regarding job performance, Rampenthal's PowerPoint presentation highlighted problematic "MWL releases and builds" due to "incorrect pistons," Murphy's visibly diminished engagement with the "DEF Quality Sensor issue resolution implementation," and the difficulties concerning "cartridge filter implementation" in connection with Rampenthal's request that Murphy take ownership over that project. *Id.* at 33. Rampenthal's desk notes detail additional issues. *See, e.g.*, Doc. 23-6 at 27 (noting an issue with "7.2L / 8.8L Head Implementation").

Murphy has failed to challenge the accuracy or legitimacy of any of Rampenthal's proffered examples that showcased his increasingly poor performance. Instead, Murphy latches onto several unavailing arguments in an attempt to persuade the Court to find pretext in Rampenthal's assessment of his performance.[16]

First, Murphy clings to the notion that Rampenthal's Desk Notes and other proffers are self-serving, and should be discredited. Doc. 25 at 82. However, the Seventh Circuit routinely reminds district courts that self-serving evidence may be used by a party to tell their story at

---

[16] One of Murphy's arguments is that Rampenthal's continuous criticism through email, to the point where Rampenthal had to apologize, can be considered as circumstantial evidence to show that Murphy's performance was adequate. Doc. 25 at 87. However, Murphy's argument hinges on an apology, and the email to which he cites contains no such sentiment. *See* Doc. 26-1 at 1. Additionally, Murphy does not cogently argue as to how continuous criticisms show that he was meeting Rampenthal's expectations. In contrast, arguing that such criticisms were false and used as a basis for placing him on a PIP could potentially convince a jury that Rampenthal's concerns were pretextual, but Murphy has failed to avail himself of such an avenue of attack.

summary judgment, and so this argument must fail. *See McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017) (citations omitted).

Second, Murphy asserts in conclusory fashion that in a late February 2018 meeting, "Rampenthal acknowledged that a number of his criticisms of me were incorrect or overstated." Doc. 26 at 9. But Murphy's failure to provide any detail whatsoever as to Rampenthal's alleged acknowledgment is fatal to this argument. In particular, Murphy's declaration is of little value because he does not assert that Rampenthal admitted to an erroneous evaluation that is applicable to, or somehow cures, the aforementioned examples of Murphy performance deficiencies.[17]

---

[17] The Court would be remiss not to address the importance placed by Murphy on the February 23, 2018, email chains concerning the "HALT" rig noise/sound. Doc. 25 at 21-22. As noted, Rampenthal expressed concern that the "HALT Rig Front Geartrain Noise" issue had been pushed out, and asked Murphy about his plan to resolve the issue. Doc. 23-2 at 14. Murphy responded by stating it was out of his control, and he asked whether Rampenthal wanted "to hire more people to work in TC-L." *Id.* Rampenthal interpreted Murphy's response as "dismissive and inappropriate." Doc. 23-6 at 3. Then, in a different, albeit seemingly related, email chain, Rampenthal stated that Murphy's recommendation as to the "HALT rig sound issue" was reasonable, and Rampenthal also thanked Murphy for the reply. Doc. 26-1 at 9.

It is entirely unclear how Rampenthal admitting to Murphy that a recommendation was reasonable, or thanking Murphy for the reply, can demonstrate pretext - if anything it seems to illustrate Rampenthal's candor and collegiality. However, Murphy seems to argue that Rampenthal's characterization of Murphy's initial response was disingenuous because Murphy's question about hiring more people was the recommendation that Rampenthal referred to as reasonable. But the record is opaque as to whether Murphy's "suggestion" of hiring more people is tantamount to the "reasonable recommendation" as indicated by Rampenthal. Indeed, the first emails were sent at approximately 9:00 am whereas the latter emails were sent at around 5:30 pm. It would be unrealistic to assume that no other communication regarding the issue took place in that 8-hour time frame. Yet, even assuming arguendo that Murphy's question about hiring more people was actually *the* "reasonable recommendation," it is not out of left field for Rampenthal to view such a response as dismissive. Murphy failed to actually answer Rampenthal's query about the plan to fix the issue, instead, he merely pushed the blame onto another department (*i.e.*, the lab), and without any context he asked whether Rampenthal wanted to hire more people. Perhaps there are other emails that would paint the evidence in a different picture, but Murphy has failed to provide such communications. Thus, even if Murphy was correct or reasonable to "recommend" hiring more people, Rampenthal would not be patently disingenuous in believing that the question was inappropriate. After all, rightness does not justify rudeness. Also of relevance here and

Finally, Murphy claims that "it strains credulity to believe that plaintiff's performance fell from meeting and exceeding expectations for all of 2017 to failing a few short months later…." Doc. 25 at 87. However, Murphy's prior positive performance evaluations do not create a genuine dispute of material fact, contrary to his assertion, for "the critical inquiry is [his] 'performance at the time of [his] termination.'" *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 753 (7th Cir. 2006) (quoting *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 901 (7th Cir. 2005)). Indeed, Murphy's prior evaluations "cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken." *Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998). Furthermore, the performance evaluations, at least as far back as 2015, support Rampenthal's assessment.

In Murphy's 2015 review, CAT clearly sets the expectation for 2016 and 2017 that Murphy would need to provide program leadership in the cartridge filter program, and would need "deep knowledge" of the job ownership processes. Doc. 27-10 at 2. In that same review, CAT indicates that Murphy "needs to better demonstrate his ability to delegate appropriate tasks to team members, but must also recognize when to more fully engage in the processes to ensure timely delivery of developmental tasks." *Id.* These same points were echoed in Murphy's 2016 review, where CAT indicated that he "takes a hands-off approach with his team, which at times is effective. However, when problems are encountered that demand additional leadership and support, he finds himself relying heavily on the experiences of others, when he should now have the background to make a quick decision/recommendation." Doc. 27-11 at 4. Murphy's 2016 review also indicated that in 2017, "he will likely need to take on additional applications to ensure a more balanced

---

important to the Court's analysis, the HALT rig issue, as it relates to Murphy's job performance and leadership rather than his tone, was not used as a basis for placing Murphy on the PIP.

workload with his peers." *Id.* at 5. Again, Murphy's 2017 review noted similar issues as in prior years. It stated that Murphy needed "…to focus on follow-through, and implementation planning and execution." Doc. 27-5 at 14. The review also cautioned that Murphy must "improve his personal ownership on implementing solutions," *id.* at 22, and that he delegated implementation tasks "to his less experience[sic] Job Owners, which has made it more of a challenge for him to gain direct, application experience with some of these tools and processes." *Id.* at 20.

These reviews culminate to show that Murphy had been on notice of his need to 1) take accountability for implementation efforts, 2) be directly involved in - and deepen his knowledge of - his job owners' projects, and 3) take a larger leadership role in the cartridge filter program. With such notice, Murphy cannot reasonably argue that he was blindsided by Rampenthal's concerns or that Rampenthal's perception of his drop in performance was untenably precipitous. Murphy's submission of his prior performance reviews has certainly helped the Court analyze whether Rampenthal's assessment was pretextual, just not with the results Murphy had hoped for.

In light of the foregoing, no reasonable person could conclude that Rampenthal's concern over Murphy's leadership style was dishonest. Likewise, no reasonable person could find that Rampenthal's apprehension over Murphy's ability to take responsibility for the cartridge filtration project at Seguin was implausible. The Court now turns to the concerns over Murphy's attendance.

The plan described Murphy's attendance expectations as follows, Doc. 27-5 at 39:

**3. Attedance - Expectation**

**Needs Improvement:**
Brian must ensure that he continues to meet his work commitments, ensuring that he is putting in a solid workday of tangible work, and 40 hours / week with the exception of reasonable excused absences (i.e. doctor / personal appointments, team functions, travel between facilities, vacation / pesonal time).

The badge report records, discussed *supra*, clearly show that between October 2017 and February 2018, Murphy's worked less than 40 hours per week, as he did not normally work from

home. Murphy's attendance practice was contrary to Rampenthal's expectations. Murphy's mistaken belief that he was entitled to a 15-minute break every four hours does not undermine Rampenthal's assessment of his attendance. Similarly, Murphy avers that his proffer of a "corrected" timesheet demonstrates that he was actually working more than 40 hours a week. Doc. 26-1 at 12-14. But Murphy does not claim that he shared this "corrected" timesheet with Rampenthal prior to his constructive discharge. Nor is it clear that sharing the "corrections" would have made a difference, as Rampenthal clearly, and reasonably, relied on the badge reports to determine Murphy's attendance. Additionally, Rampenthal was motivated to investigate Murphy's attendance based on his personal observations that Murphy, even though his work was not getting done, sometimes arrived at work late, left work early, and took long lunches. Doc. 27-3 at 31-33.[18] Murphy's attendance issues were exacerbated by his claim that CAT needed more workers. *Id.* Thus, Murphy has failed to point to any evidence in the record that would permit a reasonable person to believe that Rampenthal's assessment of Murphy's average workday, with respect to hours worked, was dishonest.[19] Finally, the Court turns to Murphy's shortcomings as to his values-based competency and ability to build inclusive relationships.

As to Murphy's interpersonal challenges, the plan provided, Doc. 27-5 at 40:

---

[18] The Court recognizes that, per Rampenthal's meeting notes, Murphy claimed that "he was being discriminated against for being single, stating that he doesn't have a big meal to come home to at night, and lunch his biggest meal of the day." Doc. 23-6 at 28. The Court offers no other comment on this other than to point out that "being single" does not constitute a class of persons protected by federal civil rights laws or the Constitution.

Also, per those same meeting notes, Murphy claimed that he felt threatened by Rampenthal, but this disputed fact is immaterial to the Motion. Doc. 23-6 at 28.

[19] Murphy argues that prior to October 2017, he worked well over 40 hours a week, which indicates that his attendance was sufficient. Doc. 25 at 86. But this only supports CAT's position. It illustrates that beginning in late 2017 there was an appreciable reduction in the hours worked by Murphy, and Rampenthal took notice.

**4. Building Inclusive Relationships – Values-Based Competency**

**Needs Improvement:**
Brian has been identified as commenting to an individual in an offensive way, refering to twice to their enthicity.  Brian has since apologized for the occurance, but due to similar events occurring in the past five years, this was elevated as a concern which could be attributed to a pattern.

As discussed, the record is clear that Murphy made offensive remarks to two persons of Asian descent in the days preceding the action plan. The record is also clear that Murphy previously made two off-color remarks in 2013 regarding the race of a criminal defendant and a woman's interest in "vibrations." In addition, Murphy made an offensive remark to a female assistant about "fondling" her keyboard. Although CAT had already decided to place Murphy on an action plan for other reasons, it was perfectly reasonable for Rampenthal to conclude that Murphy was failing to meet Rampenthal's expectations as to values-based competency and thus it would be unreasonable to find that Rampenthal was deceitful in adding this goal to the plan.

Ultimately, Murphy has failed to show that Rampenthal's assessment that he failed to meet CAT's legitimate performance expectations was dishonest or rooted in pretext. Through Murphy's own admission, he does not have "direct evidence" to rebut Rampenthal's belief as to his deteriorating performance. Doc. 25 at 86. Thus, even though he "must offer more than mere self-serving appraisals" of his performance, he has failed to do so. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 784 (7th Cir. 2007) (citations omitted). [20] Accordingly, the results of the *McDonell Douglas* burden-shifting framework weigh in favor of the Court granting the Motion.

---

[20] The Court recognizes that Murphy offers into evidence certain laudatory emails from colleagues indicating that he is meeting CAT's legitimate performance expectations. *See, e.g.*, Doc. 26-2 at 18-19. However, the Court is not convinced that he has created a genuine dispute of material fact. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("[T]he general statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated."); *see also Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994) ("Our cases ... give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory

Yet, as noted, a *prima facie* analysis is not dispositive of an age discrimination claim. Just as useful to the Court's determination is a review of the evidence with *but-for* causation in mind.

For Murphy's claim to succeed under the ADEA, he must show that age was the *but-for* cause of his constructive discharge. "In this respect, the ADEA is narrower than" other federal anti-discrimination statutes as it does not "protect[] against mixed-motive discrimination." *Carson v. Lake Cnty., Ind.*, 865 F.3d 526, 532 (7th Cir. 2017) (citing *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007)). Plainly stated, there is not an iota of evidence in the record that indicates CAT was motivated by Murphy's age, and summary judgment is the stage where a plaintiff "'must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)).[21] And "if the non-movant

---

job performance."). In this way, the Court also refrains from relying on Bruce's harsh statements as to Murphy's performance. *See* Doc. 23-6 at 5 (Rampenthal recalling that Bruce "blew up" at Murphy due to Murphy' failure to take ownership of project implementation). As noted, the Court's inquiry is to determine whether Murphy's supervisor, Rampenthal, honestly believed that Murphy's performance was deficient. And, Rampenthal's Desk Notes illustrate that Bruce's critiques were not to be taken as true without proof. In charting Bruce's accusations, Rampenthal wrote, *id.* at 25: "Brian's attendance, performance, and conduct such as that outlined above (if proven - this was not observed first hand, but is not uncharacteristic of Brian's conduct)." Although there is a genuine dispute of fact as to whether Bruce delivered critiques of Murphy's performance pursuant to Rampenthal's request, such a dispute is not material as it does not illustrate pretext, discrimination, or retaliatory animus. *See* Doc. 26-1 at 10-11 (Bruce writing to Rampenthal, stating "Matt, As per our Friday afternoon discussion…" and then detailing what he believed to be Murphy's performance issues). A plaintiff's performance is to be evaluated from the eyes of his supervisor, not through the lens of a coworker, and so the Court's discussion in this footnote moots Murphy's argument that CAT's failure to identify witnesses to corroborate Rampenthal's assessment necessarily implicates pretext. Doc. 25 at 87.

[21] Murphy seems to place a lot of weight on the fact that he declined to participate in CAT's Voluntary Retirement Enhancement Program ("VREP") in 2015 at age 56. It is not abundantly clear how this information is salient to Murphy's case, other than showing that Rampenthal had constructive knowledge of Murphy's age given that the program was only offered to individuals over the age of 55. It is also unclear as to why Murphy discusses the ages of Swanson and Bruce in connection with VREP. To the extent that Murphy alludes to some sort of discrimination based

[in a summary judgment proceeding] does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court **must** enter summary judgment against her." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citation omitted). Given the utter lack of evidence concerning age discrimination, no reasonable jury would be able to conclude that age was the *but-for* cause of Murphy's discharge.

In light of the Court's foregoing holistic review of the evidence, including through the lens of the *prima facie* framework under *McDonell Douglas* and an assessment of the ADEA's *but-for* cause requirement, Murphy has failed to marshal evidence in the record indicating, even when viewed in his favor, a genuine dispute of material fact as to whether he was discriminated against in violation of the ADEA.[22] Accordingly, the Court GRANTS CAT's Motion as to Count I.

---

on his refusing to participate in VREP, it is not supported by the record or otherwise cogently stated in the briefing. *See Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) ("It is reasonable to assume that just as a district court is not required to scour the record looking for factual disputes, it is not required to scour the party's various submissions to piece together appropriate arguments.") (citation and quotation omitted). Indeed, Murphy received positive evaluations from 2015 up until the events leading up to his termination in 2018. Therefore, Murphy's discussion of the VREP program appears little more than a red herring that is wholly insufficient to show that age was the *but-for* cause of his discharge.

[22] Although not addressed by CAT as an alternative basis for Murphy's discharge, the Court notes that several instances in the record indicate that the animus for terminating Murphy may have been his contentious relationships with his coworkers, distinct from the off-color comments discussed *supra*. As Rampenthal stated at his deposition as to Murphy's conduct, "there was always elements of some level of defiance." Doc. 27-3 at 28. And Huber noted that Murphy was "combative from the getgo" when informed that he would be placed on a PIP. Doc. 27-2 ag 33. Rampenthal also noted that Murphy was denied transfer to a different division because he "treated his employees like a bully in 2018." Doc. 23-6 at 28. Indeed, even at his deposition, which is an official court proceeding, Murphy, at times, offered a quip instead of answering the question asked of him. *See, e.g.*, Doc. 23-1 at 17 (when asked if he understood that he needed "leadership skills to be a leader," Murphy responded by stating "I understood that I demonstrated those skills and that…"). At one point, Murphy's lawyer had to tell him to "just answer the question." Doc. 23-1 at 43. The Court does not consider these interpersonal conflicts in arriving at its decision to grant the Motion, but it bears remarking that a "poor work attitude" can constitute a legitimate non-discriminatory basis for termination. *Roberts v. Separators, Inc.*, 172 F.3d 448, 453 (7th Cir. 1999).

Retaliation (Counts II and III)

As noted, Murphy alleges that CAT constructively discharged him in retaliation for his 2001 case. Doc. 1 at 12-12. In turn, Murphy argues that CAT violated the anti-retaliation sections of the ADEA and breached the provision in the Agreement concerning retaliation. *Id.* The Parties agree that there is no material difference in analyzing Counts II and III, and so the Court analyzes Murphy's retaliation claims together. *See* Doc. 23 at 34-35; Doc. 25 at 89; Doc. 32 at 131.

Under the ADEA, it is unlawful for employers to retaliate against an employee who complains of discrimination. 29 U.S.C. § 623(d). Construing all facts in Murphy's favor at this stage, under the direct method of establishing his claim, he must show that "(1) []he engaged in protected activity, (2) []he suffered an adverse action, and (3) there was a 'but for' causal connection between the two." *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020) (quoting *Rowlands v. United Parcel Serv.*, 901 F.3d 792, 801 (7th Cir. 2018)).[23] The plaintiff may rely on either direct or circumstantial evidence of a causal link "from which a jury may infer intentional discrimination." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015); *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) (evidence must show employer acted with retaliatory animus). Furthermore, this causal link must show that the

---

[23] Murphy correctly notes that he may also proceed under the indirect method to establish his retaliation claim. The Seventh Circuit recounted this method in *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595(7th Cir. 2011). The court stated, *id.* at 601-02 (citations omitted): "Plaintiffs can also elect to use the indirect, burden-shifting method for retaliation claims, under which the plaintiff must demonstrate that he (1) engaged in protected activity; (2) was performing his job satisfactorily; and (3) was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer. Once a plaintiff satisfies his initial burden, the burden then shifts to the defendant to present a non-invidious reason for the adverse employment action. If the defendant meets this burden, the plaintiff must then demonstrate that the defendant's proffered reason was pretextual." However, for the same reasons that Murphy failed to demonstrate pretext in connection with his discrimination claim, so too is he unable to show pretext here.

plaintiff's "protected activity was the but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). While a plaintiff need not "produce the equivalent of an admission of guilt by the defendant" to survive summary judgment, he must proffer "evidence from which a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because the latter was a member of a protected class." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994); *accord Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 761 (7th Cir. 2022) (plaintiff survives summary judgment motion so long as a "reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action").

Murphy easily demonstrates the first factor, as he engaged in statutorily protected activity when he filed the 2001 lawsuit. *See Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009) (holding that a plaintiff's lawsuit about the purported discrimination was statutorily protected activity). And, for the reasons discussed *supra*, there is a genuine dispute of material fact as to whether Murphy suffered an adverse employment action through constructive discharge. Thus, the second factor is also satisfied at this juncture. Therefore, the Court turns to the most vigorously disputed, and incidentally dispositive, final factor of Murphy's retaliation claim – causation.

To determine if there is a genuine issue of material fact as to whether a plaintiff's protected activity caused his termination, the court must "consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation." *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017). Furthermore, a causal nexus can be established by circumstantial evidence, which may include "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Gnutek v. Illinois Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023) (quoting

*Rozumalski v. W.F. Baird & Assoc., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019)). "Each of these categories can suffice by itself to preclude summary judgment, depending on its strength in relation to the other evidence, but plaintiffs may also use them together." *Shoenthal v. City of Seymour*, TWP-21-79, 2024 WL 113674, at *16 (S.D. Ind. Jan. 10, 2024) (citations omitted).

The Court need not rehash its earlier analysis as to pretext, as it is equally applicable here, and so that aspect of causation does little to assist Murphy in establishing retaliation. Additionally, Murphy does not point to any significant statements or behavior that may indicate discriminatory animus.[24] Nor does Murphy point to any preferential treatment towards other employees that possibly indicates retaliatory intent or age-based bias.[25] Thus, most impactful in the Court's decision concerning retaliation, is the questionable temporality between Murphy's lawsuit in 2001, or in the alternative, his Agreement in 2005, and his supposed constructive discharge in 2018.

Of relevance here, "an inference of retaliation 'can be weakened by a lengthy time period between the protected activity and the alleged retaliation.'" M*iller v. Madison Cnty. Bd. of Comm'rs*, JMS-21-2609, 2023 WL 2837867, at *10 (S.D. Ind. Apr. 7, 2023) (quoting *Alamo v. Bliss*, 864 F.3d 541, 556 (7th Cir. 2017) in turn quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014)); *see also Lalvani v. Cook Cnty., Illinois*, 269 F.3d 785, 790 (7th Cir. 2001) ("As the time separating the protected conduct and the adverse employment action grows, the causal inference weakens and eventually time becomes the plaintiff's enemy.").

---

[24] To the extent Murphy claims that Rampenthal's failure to recall the 2001 lawsuit constitutes a willful forgetfulness indicative of retaliatory intent, such an assertion is only of *de minimis* value to the Court in light of the evidence as a whole.

[25] If Murphy is suggesting that his constructive discharge is evidence that other employees were treated differently, and therefore supports his retaliation claim, I note that, as discussed *supra*, such an argument blends into pretext, was wholly resolved, and provides no support.

To the extent Murphy asserts that his constructive discharge in 2018 was retaliation for filing his lawsuit in 2001 or reaching the Agreement in 2005, the Court concludes that a thirteen-year lapse in time typically renders such an argument farfetched. However, "summary judgment is inappropriate when [the] record would permit [a] reasonable trier of fact to find that employer 'waited in the weeds' for years looking for an opportunity to fire [an] employee." *Castro v. DeVry University, Inc.*, 786 F.3d 559, 568 n.2 (7th Cir. 2015) (quoting *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 n.6 (7th Cir. 1996)) Even so, to the extent that Murphy argues that Sibley telling Rampenthal, in 2013, about Murphy's lawsuit constituted an intervening event (the Court need not determine whether it actually is), a five-year gap is still distant enough to weaken any inference of causation. *See, e.g., Naficy v. Illinois Dept. of Human Service*, 697 F.3d 504, 513 (7th Cir. 2012) (noting that a "five-year gap between" plaintiff's protected activity and her layoff "ma[de] it extremely unlikely that the two events were related").

Murphy attempts to explain away the huge temporal disconnect by asserting that Rampenthal considered putting him on an action plan shortly after learning of the 2001 lawsuit. But Rampenthal did not put Murphy on an action plan and instead, Murphy was required to take additional harassment training based on his above-noted off-color remarks. Thus, Rampenthal's decision to pass on the opportunity to place Murphy on an action plan nearly five years before Murphy's constructive discharge shows that this was not CAT's, or Rampenthal's, first opportunity to retaliate.[26] And to the extent that Murphy alludes to some significance in the fact that Huber was newly hired in November 2017, and Rampenthal's concerns with Murphy began around the same time, no record evidence exists to show that Huber's new station somehow

---

[26] Similarly, Murphy states that he "was not let go during 2016 or 2017 because of [his] unique expertise as a sound engineer," but this does not explain why he was not retaliated against at an earlier date. Doc. 26 at 8.

permitted Rampenthal to suddenly take issue, and subsequent action, regarding Murphy's performance. In light of the foregoing, CAT or Rampenthal cannot be said to have lied in waiting for an opportunity to retaliate, and so the court concludes that no intervening event can cure the weakened inference of retaliation brought about by the vast temporal distance between Murphy's protected activity and his constructive discharge. *See, e.g.*, *Kelley v. Costco Wholesale Corp.*, JMS-21-1885, 2023 WL 1782688, at *11 (S.D. Ind. Feb. 3, 2023).

"[T]he passage of time is not dispositive" in retaliation actions. *Baines v. Walgreen Co.*, 863 F.3d 656, 666 (7th Cir. 2017) (citing *Hicks v. Forest Preserve Dist. of Cook Cnty.*, 677 F.3d 781, 789 (7th Cir. 2012)). Nevertheless, the exorbitant durational gap between Murphy's protected activity in 2005, or alternatively in 2013, and his termination in 2018, in combination with his failure to provide any other evidence that would possibly convince a reasonable jury that he was retaliated against, forces the Court to GRANT CAT's Motion as to Counts II and III.

## Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. 30) is GRANTED in its entirety. The District Clerk is directed to SEAL Doc. 27-13. The District Clerk is directed to CLOSE the case.


Entered on this 9th day of February 2024.


s/ *James E. Shadid*
UNITED STATES DISTRICT JUDGE
